1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

THE HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STEVEN CROW and CHERYL CROW,
individually and as husband and wife, and
plaintiff CHERYL CROW on behalf of and
as parent and guardian of J.M.C., J.J.C.,
and G.E.C., minors,

   Plaintiffs,

  vs.

TRANS-SYSTEM, INC., an Indiana
corporation d/b/a JAMES J. WILLIAMS
BULK SERVICE TRANSPORT,

   Defendants.

NO.  3:15-cv-05665-RJB

PLAINTIFFS' TRIAL BRIEF

**Trial Date:  July 24, 2017**

17

18

19

20

21

22

23

24

25

## I. BACKGROUND AND INTRODUCTION

  Steven Crow was poisoned by an illegal aqueos ammonia discharge while he

was working  for Weyerhaeuser on September 27, 2012.  Mr. Crow was standing in

front of the Weyerhaeuser truck shop in Cosmopolis with three co-workers when the

four of them were overcome by an unknown gas, fumes or vapors ("Subject

Exposure")[1].  As a result of the Subject Exposure Mr. Crow suffered significant personal

---

[1] At the Pre-Trial Conference held on June 2, 2017, the Court specifically advised that a lengthy recitation
of the facts of the subject exposure was not necessary for this case.

PLAINTIFFS' TRIAL BRIEF - 1

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX:  (253) 272-5105

physical, emotional and psychological injuries.  This lawsuit seeks compensation for Plaintiffs' injuries and damages suffered as a result of the Subject Exposure.

Steven Crow was born on January 4, 1959 and is currently 58-years old.  He was 53-years old on the date of the subject exposure described below.  Steve was born and raised in Raymond, Washington.  His father was a blacksmith and handyman and his mother a school teacher.  Mr. Crow married Cheryl Crow in January of 1979.   Cheryl was born in Arizona and grew up in Montana, Tacoma and Raymond.  Steve and Cheryl have known one other since she was 13 years old.  Steve and Cheryl have four biological children and four adopted children.  Plaintiffs had a happy and fulfilling marriage and Mr. Crow had no issues with sexual dysfunction.

Steve graduated high school in 1977 and worked for several different logging companies setting chokers and doing other logging jobs for approximately five years. He was hired by Weyerhaeuser on July 6, 1981, starting as a choker setter, rigging slinger, hook tender and tree cutter.  Steve obtained his commercial driver's license in 1998 and began driving dump truck for Weyerhaeuser.  Steve worked continuously for Weyerhaeuser for approximately 33 years until the date of the subject exposure on September 27, 2012.

Cheryl has been a house wife and has also worked as a Home Health Assistant. Cheryl has been a Registered Nurse for 14 years and currently works as an RN for Wilipa Hospital.

Prior to the subject exposure incident, Steve Crow was a family man; married for 33 years; very involved in his local community.  He coached all of his children in local sports leagues and he was voted "Coach of the Year" on many occasions.  Family and

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX:  (253) 272-5105

community activities were his life; he was an avid camper, fisherman, hunter and participant in his children's extra-curricular activities and family holidays and events. Prior to the subject exposure the Plaintiffs were both very involved in family gatherings/holidays/events; their kids' sporting events (baseball, football, wrestling); their grandchildren's events; yard work; planning for the building of a new home and going to movies.  They visited friends; traveled; vacationed; camped; hiked, hunted and fished.

## II. PLAINTIFF STEVE CROW'S PARTICIPATION AT TRIAL

The Plaintiffs do not plan to have Plaintiffs present in the courtroom for this trial, except to present their testimony.  This decision has been made in the best interests of Mr. Crow's health and in conjunction with his treating healthcare providers.

Following the Subject Exposure in September of 2012, Steve Crow developed Depression and Post-Traumatic Stress Disorder ("PTSD").  Mr. Crow has undergone at least four psychiatric independent medical examinations all of which have made findings and diagnoses of PTSD and depression related to the Subject Exposure in September of 2012.  Plaintiffs' Psychiatric expert Jeff Hart, M.D., and Mr. Crow's treating Psychologist Monte Meier, Ph.D., have likewise diagnosed Mr. Crow with Major Depression and PTSD.  In addition, Michael Ward, M.D., the Psychiatrist who conducted the Independent Medical Examination for the defendant, diagnosed Mr. Crow with PTSD and Depressive Disorder, causally related to the subject incident on a more probable than not basis[22].

---

[22] See Report of Michael D. Ward, M.D., at Pages 97-98.

PLAINTIFFS' TRIAL BRIEF - 3

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX:  (253) 272-5105

Individuals with PTSD, such as Steve Crow, have a tendency to relive the incident giving rise to their PTSD, especially when the facts of the incident are repeatedly presented in front of them.  This is consistent with the diagnostic and statistical manual of the American Psychiatric Association, the diagnostic manual that psychiatrists and psychologists are mandated to use.  Therefore, in the best interest of Mr. Crow's health, Dr. Meier has recommended that Mr. Crow only appear in Court for his testimony.  Dr. Meier has advised that it could be expected that Mr. Crow would experience additional trauma by hearing all of the testimony related to the subject exposure.

## III.  LEGAL AND EVIDENTIARY ISSUES

### 1.    Washington Law on Negligence.

In order to prove a claim of negligence the Plaintiffs must prove (1) duty, (2) breach, (3) causation, and (4) injury or damages.  *Dombrosky v. Farmers Ins. Co. of Wash.*, 84 Wn. App. 245, 261, 928 P.2d 1127 (1996).

### 2.    Strict Liability for Abnormally Dangerous Activities.

In addition to their claims of negligence, the Plaintiffs have also asserted that defendant JJW is strictly liable for carrying on an abnormally dangerous activity. **Whether an activity is "abnormally dangerous" is a question of law for the court to decide**.  *Siegler v. Kuhlman*, 81 Wn.2d 448, 473 P.2d 445 (1972) (emphasis added); *See also Patrick v. Smith*, 75 Wash. 407, 134 P. 1076 (1913) (vibration damage to adjacent buildings caused by blasting).

Defendant JJW moved for summary judgment to dismiss Plaintiffs' claims of strict liability.  In denying summary judgment to the defendant the Court found that as a

PLAINTIFFS' TRIAL BRIEF - 4

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX:  (253) 272-5105

1    matter of law the Plaintiffs had established a *prima facie* case and the claim of strict

2    liability will go to the jury at trial.

3        Restatement (Second) of Torts, § 519 provides as follows:

4        (1) One who carries on an abnormally dangerous activity is subject to
         liability for harm to the person, land or chattels of another resulting from
5        the activity, although he has exercised the utmost care to prevent the
         harm.
6        (2) This strict liability is limited to the kind of harm, the possibility of which
7        makes the activity abnormally dangerous.

8        A claim of Strict Liability is a separate and distinct claim from the cause of action

9    for Negligence.  In order to succeed on their claims of strict liability, it is not necessary

10   for the Plaintiffs to prove that the defendant was negligent.  Comment d. to § 519

11   provides that liability is not based upon any intent of the defendant to do harm to the

12   plaintiff or to affect his interests, nor is it based upon any negligence, either in

13   attempting to carry on the activity itself in the first instance, or in the manner in which it

14   is carried on.  The defendant is held liable although he has exercised the utmost care to

15   prevent the harm to the plaintiff that has ensued. The liability arises out of the abnormal

16   danger of the activity itself, and the risk that it creates, of harm to those in the vicinity.

17

18       In *Pacific Northwest Bell Tel. Co. v. Port of Seattle*, 80 Wn.2d 59, 49 P.2d 1037

19   (1971), Washington adopted Restatement (Second) of Torts § 520 (1977) as a guide for

20   deciding what activities should be considered abnormally dangerous. Section 520

21   states:

22   In determining whether an activity is abnormally dangerous, the following factors are to

23   be considered:

24       (a) existence of a high degree of risk of some harm to the person, land or
25       chattels of others;

PLAINTIFFS' TRIAL BRIEF - 5

(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.

Comment f to § 520 states that all six factors are to be considered, but it is not necessary that all factors be present. Ordinarily, though, at least several are present when a court applies strict liability principles:

Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily. Because of the interplay of these various factors, it is not possible to reduce abnormally dangerous activities to any definition. The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care.

Restatement (Second) of Torts § 520, comment f (1977).

The evidence in this case clearly establishes that aqua ammonia is a hazardous substance.  Defendant JJW employee Devin Godwin testified at his deposition in part, as follows:

Page 94, Line 20 through Page 95, Line 7:

Q   Is it your understanding that this aqua ammonia product that you were delivering is a hazardous substance or hazardous material?
**A   Yeah.**
Q   Do you know what class it is?
**A   I don't remember.**
Q   Do you think you knew at the time?
**A   I'm sure at the time I remembered.**
Q   It was your responsibility as the driver to make sure the placards on the truck were correct --
**A   Oh, yeah.**
Q   -- for whatever you were hauling?
**A   Sorry.  Yes.**

PLAINTIFFS' TRIAL BRIEF - 6

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX:  (253) 272-5105

1    Mr. Godwin further testified about the Material Safety Data Sheet ("MSDS")

2  which applied to the aqua ammonia he was delivering and venting.  Mr. Godwin

3  testified as follows:

4  Page 102, Line 1 through Line 9:

5  Q   (By Mr. Fisher)  Mr. Godwin, I've handed you what's been marked as Exhibit 7 to
   your deposition.  I'll represent to you that this is the MSDS for aqua ammonia that was
6  produced in discovery. Have you seen this before?
   **A   Yes.**
7  Q   And to transport aqua ammonia, you were required to be familiar with this MSDS;
   correct?
8  **A   Yes**.

9     Section V of the MSDS for aqua ammonia lists the health hazard data for aqua

10  ammonia which includes:

11     **Eyes:**  May cause severe eye irritation with corneal injury and permanent
12     vision impairment.
     **Ingestion:**  Extremely irritating to mucous membranes causing vomiting,
13     nausea and burns.
     **Inhalation:**  The gas is extremely irritating to mucous membranes and
14     lung tissue.  Coughing, chest pain, and difficulty in breathing may result.

15     In evaluating whether an activity is abnormally dangerous, two of the factors are

16  (1) the existence of a high degree of risk of some harm to a person, and (2) likelihood

17  that the harm that results will be great.  Given the dangerous nature of aqua ammonia

18  and its propensity to cause injury, as indicated in the MSDS, the first two factors of the

19  test are satisfied.

20     Two environmental engineers for nonparty Cosmo, Arne Peterson and Craig

21  McKinney, testified in discovery that the decision to authorize the venting of aqua

22  ammonia to the atmosphere is a big deal which requires a significant amount of

23  investigation and calculation before being approved.  This is because aqua ammonia is

24  a hazardous chemical, it can cause significant injury and its release is subject to

25  various laws, regulations, codes and rules. At the time of the subject incident Donna

PLAINTIFFS' TRIAL BRIEF - 7

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX:  (253) 272-5105

1  Parsons was the Safety and Health Manager for Cosmo.  At her deposition, Ms.

2  Parson's testified as follows:

3  Page 73, Line 17 through Line 22:

4  Q  If a delivery driver wanted to request permission to vent aqua ammonia into the
5  atmosphere, is the decision to grant or deny permission to do that, is that something
   that should involve you as the safety director?
6  **A  That would involve myself and the environmental department because it's an
   exposure to the environment.**

7         At his deposition, JJW driver Devin Godwin testified about the dangers of aqua
8  ammonia as follows:

9  Page 102, Line 1 through Page 103, Line 5:

10 Q  (By Mr. Fisher)  Mr. Godwin, I've handed you what's been marked as Exhibit 7 to
11 your deposition.  I'll represent to you that this is the MSDS for aqua ammonia that was
   produced in discovery.  Have you seen this before?
12 **A  Yes.**
   Q  And to transport aqua ammonia, you were required to be familiar with this MSDS;
13 correct?
   **A  Yes**.
14 Q  On the third page of Exhibit 7, there's a Section VII, "Spill or Leak Procedures."  Do
15 you see that?
   **A  Yeah**.
16 Q  It says, "Keep people away.  Stay upwind and warn people downwind of possible
   exposure."  Do you see that?
17 **A  Yep.**
   Q  Were you aware that that was something that needed to be done regarding aqua
18 ammonia in September of 2012?
                MR. HORNBROOK:  Objection to form.  Go ahead.
19 **A  Yeah.**
   Q  (By Mr. Fisher)  On the dates at Cosmo when you were venting ammonia to the
20 atmosphere or driving to the secluded area with the vents open, did you undertake any
   effort to keep people away or to warn people downwind that you were venting
21 ammonia?
                MR. HORNBROOK:  Objection.  Form.  Misstates testimony.
22 **A  I did not.**

23         In the present case the testimony of JJW driver Devin Godwin is that he made
24 the decision to vent aqua ammonia "on the spot," without any investigation or

25

PLAINTIFFS' TRIAL BRIEF - 8

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX:  (253) 272-5105

1   calculations, on the date of the subject incident.  Mr. Godwin failed to take any action to

2   protect persons downwind from the aqua ammonia being vented as required by the

3   MSDS for aqua ammonia.

4        In evaluating whether an activity is abnormally dangerous, the third and fifth

5   factors are (3) inability to eliminate the risk by the exercise of reasonable care, and (4)

6   inappropriateness of the activity to the place where it is carried on.  Devin Godwin

7   testified that aqua ammonia is a hazardous material that is subject to specific

8   restrictions under the MSDS for aqua ammonia, including the requirement that anyone

9   downwind be notified of any release of aqua ammonia fumes.  Mr. McKinney and Mr.

10   Peterson testified that they would not authorize anyone to vent aqua ammonia fumes

11   directly to the atmosphere under normal circumstances, and certainly would not do so

12   just because it would be a quicker method of venting the tanker trailer.

13        Mr. McKinney testified regarding the significant and complex calculations that

14   would be required before permitting a driver to vent aqua ammonia fumes to the

15   atmosphere.  Furthermore, Mr. McKinney testified regarding the requirement to make

16   sure that no one was downwind of any such venting and to take precautions to ensure

17   that no one entered the downwind area if such venting of aqua ammonia fumes was

18   permitted.

19        Mr. McKinney and Mr. Peterson both testified that if the proper investigation and

20   calculations are made, that you can eliminate the risk of harm associated with venting

21   aqua ammonia gas.  This satisfies the third factor of the test for abnormally dangerous

22   activities.

23        All of these witnesses will testify that prior to any such release of ammonia gas,

24   you must clear the downwind area of people to avoid any exposure.  Mr. Godwin failed

25   to undertake any effort to warn or clear out persons downwind before the venting of

PLAINTIFFS' TRIAL BRIEF - 9

aqua ammonia gas from his tanker trailer.  It was therefore an inappropriate place to engage in the activity of venting aqua ammonia gas which satisfies the fifth factor of the test for abnormally dangerous activities.

There will be substantial testimony and evidence in this case to establish that the venting of aqua ammonia fumes poses a high degree of risk of harm to persons and the likelihood of harm due to any such venting, the significant efforts and precautions that would be required to protect others before any such venting and the inappropriateness of venting aqua ammonia fumes at the Cosmo facility.  The testimony of Devin Godwin and that of Environmental Engineers Arne Peterson and Craig McKinney will confirm that venting aqua ammonia fumes to the atmosphere is not a matter of common usage and that there is no value to such an activity which outweighs the risks, even if such activity would permit a delivery driver to perform their job more quickly.  This satisfies the sixth factor of the test for abnormally dangerous activities.

The facts of this case are directly analogous to established case law holding that the release into the air of poisonous gas or dust is typically considered an abnormally dangerous activity: *Luthringer v. Moore*, 31 Cal.2d 489, 190 P.2d 1 (1948) (fumigation with cyanide gas); *Gotreaux v. Gary*, 232 La. 373, 94 So.2d 293 (1957), appeal transferred, 80 So.2d 578 (crop dusting); *Dutton v. Rocky Mt. Phosphates,* 151 Mont. 54, 438 P. 2d 674 (1968) (fluorine); *Young v. Darter*, 363 P.2d 829 (Okla. 1961) (herbicide spray); *Loe v. Lenhardt*, 227 Or. 242, 362 P.2d 312 (1961) (crop dusting).

Defendant JJW should be subject to strict liability for the harms suffered by the Plaintiffs as a result of the venting of aqua ammonia into the atmosphere leading to the subject exposure event on September 27, 2012.

////

////

PLAINTIFFS' TRIAL BRIEF - 10

### 3.   **Defendant is Limited to Affirmative Defenses Plead in Answer.**

In Answer to the Plaintiffs' Complain defendant JJW asserted the following Affirmative Defenses which may be applicable at trial: (1) Plaintiffs failed to mitigate their damages; (3) any injuries or damages suffered by the Plaintiffs were the direct and proximate result of **negligence of other individuals** not readily known to the defendant and (4) Pursuant to RCW 4.22.070, defendant JJW is entitled to an allocation of fault and a determination of a proportionate share of fault of all persons and/or entities causing damages for which the Plaintiffs seek recovery.  *See,* Defendant's Answer, Page 7 (emphasis added).

Any Affirmative Defenses not plead by the defendant in Answer to the Complaint are waived and may not be raised for the first time at trial.  Specifically, the defendant has not asserted an Affirmative Defense that Steve Crow was in any way at fault for the subject exposure incident and Mr. Crow should be determined to be fault free for purposes of trial.  In addition, defendant JJW has asserted that negligence on the part of nonparty Cosmo may have been a cause of the subject exposure incident. Significantly, the defendant's Affirmative Defense did not assert any Strict Liability on the part of Cosmo was a proximate cause of the injuries to Steve Crow.

With regard to the defendant's Affirmative Defense of nonparty fault specifically against Cosmo, the defendant bears the burden of proving the Affirmative Defense by a preponderance of the evidence.  An affirmative defense is more than just a denial of the plaintiff's allegations, it is a defense which raises additional issues which would serve to relieve the defendant of liability even if the plaintiff's contentions were determined to be correct.  Because the defendant is the one raising new issues in connection with an

PLAINTIFFS' TRIAL BRIEF - 11

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX: (253) 272-5105

affirmative defense, the defendant has the burden of proof on the affirmative defense.
See *Rivas v. Overlake Hosp. Med. Ctr.,* 164 Wn.2d 261, 267, 189 P.3d 753 (2008)
(defendant carries burden of proof on affirmative defense).

In the present case defendant JJW has plead the affirmative defense that an
RCW 4.22.070 allocation of fault is appropriate due to nonparty liability on the part of
Cosmo.  The affirmative defense found at RCW 4.22.070(1) provides in pertinent part:

> In all actions involving fault of more than one entity, the trier of fact shall
> determine the percentage of the total fault which is attributable to every
> entity which **caused** the claimant's damages . . . The sum of the
> percentages of the total fault attributed to at-fault entities shall equal one
> hundred percent.
>
> * * *
>
> Judgment shall be entered against each defendant except those that have
> been released by the claimant or are immune from liability to the claimant
> or have prevailed on any other individual defense against the claimant in
> an amount which represents that party's proportionate share of the
> claimant's total damages.

RCW 4.22.070 (emphasis added).

By operation of RCW 4.22.070, if defendant JJW successfully establishes a
*prima facie* case at trial that nonparty Cosmo was negligent in causing the subject
exposure incident, then Cosmo can be included on the jury verdict form and the jury can
be instructed to determine if a proportionate share of the fault for negligence should be
allocated to nonparty Cosmo.  In such a scenario, the percentage amount allocated to
nonparty Cosmo is never collectible because judgment is never entered against the
nonparty on that specific amount.  RCW 4.22.070(1); see *Mazon v. Krafchick,* 158
Wn.2d 440, 452, 144 P.3d 1168 (2006).  This is commonly called the "empty chair"
defense.  See *Hiner v. Bridgestone/Firestone, Inc.,* 138 Wn.2d 248, 260, 978 P.2d 505

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX:  (253) 272-5105

1   (1999).

2        Defendant JJW bears the burden of coming forward with affirmative evidence

3   that nonparty Cosmo was both negligent **and** proximately caused injury to Steve Crow

4   in order to establish the affirmative defense of nonparty fault.

5       **4.**     **Plaintiffs' Burden of Proof is More Probably Than Not.**

6        The Plaintiffs are not required to prove proximate cause beyond a reasonable

7   doubt or by direct and positive evidence.  RCW 4.24.290, which specifically applies to

8   physicians, provides in pertinent part:

9
10      [T]he plaintiff in order to prevail shall be required to prove by a
        preponderance of the evidence that the defendant or defendants failed to
        exercise that degree of skill, care and learning possessed at that time by
11      other persons in the same profession, and that as a proximate result of
        such failure the plaintiff suffered damages . . .

12
13       In meeting this burden of proof, it is necessary only that the plaintiff "show a

14  chain of circumstances from which the ultimate fact required to be established is

15  reasonably and naturally inferable."  *Teig v. St. John's Hospital,* 63 Wn.2d 369, 381, 387

16  P.2d 527 (1963).  Washington requires that a doctor's testimony establish that the

17  incident relied on was "more likely than not" the cause of the injury claimed.  In

18  *Clevenger v. Fronseca,* 55 Wn.2d 25, 32, 245 P.2d 1098 (1959), the court stated: "The

19  rule that it must appear from medical testimony that the incident relied upon was more

20  likely than not the cause of the injury claimed."  The plaintiff is not required to eliminate

21  all other possible causes of injury:

22      The plaintiff is not required to eliminate with certainty all other possible
        causes or inferences . . ., which would mean that he must prove a civil
23      cause beyond a reasonable doubt.  All that is needed is evidence from
        which reasonable men can say that on the whole it is more likely that there
24      was negligence associated with the cause of the event that that there was
25      not.

PLAINTIFFS' TRIAL BRIEF - 13

1

*Douglas v. Bussabarger,* 73 Wn.2d 476, 486, 428 P.2d 829 (1968).

2

3

There is no dispute that Mr. Crow and his co-workers were exposed to some

4

chemical, gas or fumes on September 27, 2012.  This fact is not denied by the

5

defendant and is confirmed by Mr. Crow and by his co-workers who were exposed.  The

6

fact of the subject exposure is further established by Mr. Crow's medical providers, and

7

specifically by Plaintiffs' expert Jordan Firestone, MD, Ph.D., MPH, who has

8

documented the injury and damage to Mr. Crow's eyes and lungs related to this

9

exposure.  Specifically, Dr. Firestone states in his declaration as follows:

10

> Based upon my review of the documents and materials in this case, and
> based upon my background, training, education and experience, it is my

11

> opinion that on September 27, 2012, Steven Crow was exposed to
> aqueous ammonia vapor/gas ("subject exposure") in a concentration high

12

> enough to have resulted in physical injuries and damage to his cornea,
> nasal passages and airways (trachea and bronchial tubes).

13

Declaration of Jordan A. Firestone, MD, PhD, MPH, Page 2, Lines 12-17.

14

There is also significant circumstantial evidence that the venting of aqua

15

ammonia to the atmosphere between 1:20 pm and 1:40 pm was the cause of the

16

subject exposure incident.  The fact that the evidence regarding the timing of the event

17

is circumstantial is of no consequence.  In *Faust v. Albertson,* the Supreme Court held

18

that a jury may decide any fact issue by circumstantial evidence, whose value is

19

equivalent to direct evidence:

20

> Typically, plaintiffs "may establish any fact by circumstantial

21

> evidence." *Tabak v. State*, 73 Wash. App. 691, 696, 870 P.2d 1014
> (1994). **Before juries, circumstantial and direct evidence are viewed**

22

> **as equivalently valuable**.

23

*Faust v. Albertson*, 166 Wn.2d 653, 658, 211 P.3d 400 (2009) (emphasis added).

24

////

25

PLAINTIFFS' TRIAL BRIEF - 14

## IV. TRIAL WITNESSES AND SCHEDULING OF TRIAL TESTIMONY.

Trial of this matter, originally set for June 12, 2017, was continued to July 24, 2017. During that intervening period the parties took the video preservation deposition of form Cosmo employee Donna Parsons, as Ms. Parsons had advised that she would not be available for trial. In addition the Plaintiffs have taken video preservation depositions of their trucking expert Paul Herbert, Neuropsychologist Laura Dahmer-White, Ph.D. and four of Plaintiffs' lay witnesses on damages. These video preservation depositions will allow the parties some flexibility to fill in gaps in testimony and to be as efficient as possible in the use of the Court's trial time.

The parties have also cooperated in the scheduling of witnesses for Plaintiffs' case in chief. Counsel for nonparty Cosmo assisted in accepting service of trial subpoenas for the Cosmo witnesses. Counsel for defendant JJW coordinated with Weyerhaeuser to schedule acceptance of service of trial subpoenas for various employees of Weyerhaeuser as well as for two former employees of defendant JJW.

Through this process counsel for the parties learned that Weyerhaeuser employee Kandi Johnson has an anxiety disorder, suffered significant distress following her deposition and that Ms. Johnson's medical providers did not feel it was appropriate for Ms. Johnson to testify at trial for medical reasons. Counsel for the parties were also advised that Weyerhaeuser employee Dave McCullough was very resistant to testifying at trial. Counsel for the parties have agreed to designate and read portions of the discovery depositions for Ms. Johnson and Mr. McCullough rather than compelling them to attend trial and testify in person.

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX: (253) 272-5105

Attached hereto as **Exhibit A** is a copy of the calendar of trial witnesses that has been prepared by Plaintiffs' counsel.  While not carved in stone, the trial calendar represents the anticipated dates and times for the testimony of witnesses in Plaintiffs' case in chief.  **Exhibit A** has been shared with defense counsel.  Defense counsel has been invited to share a similar calendar for testifying witnesses in the defense case in chief.

## V.  STATEMENT OF RELIEF REQUESTED

**A.   WASHINGTON LAW ON DAMAGES.**

Washington case law makes a clear distinction between the sufficiency of evidence to establish the "fact of damage" and the sufficiency of evidence to sustain the "amount awarded."  Once the fact of damage has been established by substantial evidence, a more liberal rule applies requiring only that there be a reasonable basis for estimating a loss, and the substantial evidence test nor longer applies.  This rule is particularly applicable to a plaintiff's proof of future damages.

Our Supreme Court in the case of *Larson v. Union Inv. Loan Co.*, 168 Wash. 5, 11, 10 P.2d 557 (1932) cited the holding of the United States Supreme Court in the case of *Storey Parchment Co., v. Patterson Parchment Co.*, 282 U.S. 555, 75 L.Ed. 544, and pointed out the distinction between cases in which the evidence of the fact of damages is uncertain and those in which the fact of damages is clearly established, the uncertainty existing only as to the extent of damages:

> It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount.  The rule which precludes the recovery of uncertain damages applies to such as are not

PLAINTIFFS' TRIAL BRIEF - 16

the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect to their amount.

*Larson v. Union Inv. Loan Co., supra.*

The reason for the more liberal rule governing proof of the amount of damages is the elementary principle of justice that where the fact of the damages has been proved, the wrongdoer must bear the risk of uncertainty of proof of the extent of the damages caused by his wrong. *Kramer v. Portland-Seattle Auto Freight*, 43 Wn.2d 386, 261 P.2d 692 (1953). The *Kramer* decision recognized this principle when it quoted with approval the following passage from *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 265, 90 L.Ed. 652, 66 S. Ct. 574 (1946):

> The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty, which his own wrong has created. . . . The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. The difficulty of ascertainment is no longer confused with the right of recovery for a proven invasion of the plaintiff's rights.

Once a plaintiff has established the fact of damages, difficulties of proof that prevent an absolute establishment of the specific amount of damages, will not preclude recovery. *Sund v. Keating*, 43 Wn.2d 36, 259 P.2d 1113 (1953); *Wenzlar & Ward v. Sellen,* 53 Wn.2d 96, 330 P.2d 1068 (1958). Mathematical precision or exactness is not required. *Golden Gate Hop Ranch, Inc. v. Velsicol Chem. Corp.*, 66 Wn.2d 469, 403 P.2d 351 (1965).

      1.    **Plaintiff/Lay witnesses may testify concerning Plaintiff's subjective symptoms.**

An injured person's testimony concerning his own subjective symptoms, including pain, suffering and limitations of physical movements is admissible and

PLAINTIFFS' TRIAL BRIEF - 17

probative. *Bitzan v. Parisi*, 99 Wn.2d 116, 123, 558 P.2d 775, 778-79 (1977).

**2.   Non-experts may testify regarding Plaintiff's injuries.**

In *Bitzan v. Parisi*, 99 Wn.2d 116, 123, 558 P.2d 775 (1977), the Court said:

> There is no reason laymen may not testify to their sensory perceptions,
> the weight of the testimony to be determined by the trier of fact.
> Physical movement by the injured person can be seen and described
> by a layman with no prior medical training or skill. . . .  Furthermore, an
> injured person can testify to subject symptoms of pain and suffering,
> and to the limitations of his physical movements

(Citations omitted.)

**3.   Photographs, X-rays and other documentary evidence should be liberally admitted into evidence.**

In *Kelly v. Spokane*, 83 Wash. 55, 58, 146 Pac. (1914), the Court said:

> We deem it pertinent, however, to say that the practice of admitting
> photographs and models in evidence in all proper cases should be
> encouraged.

It is not necessary to call the person taking the photograph to make it admissible.

*State v. Tatum*, 57 Wn.2d 516, 358 P.2d 120 (1961)

**4.   Subjective evidence of pain and suffering at trial requires an instruction on future damages – expert testimony is not necessary.**

In *Bitzan v. Parisi*, 88 Wn.2d 116, 122, 558 P.2d 775 (1977) the court stated in

pertinent part as follows:

> Proof of pain and suffering as late as at time of trial even though
> subjective in character will warrant an instruction of future damages.
> The same is true of proof of disability and lost earnings.  The
> continued existence of these elements of damage at the time of trial
> permits a reasonable inference that future damage will be sustained.
> Expert medical testimony to this effect may also be given but it is not
> essential. . . .
>
> In cases such as these a future damage instruction can be given *even
> though there is no medical testimony*, or even if the medical testimony
> is contrary to the plaintiff's testimony of continued pain.

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX: (253) 272-5105

(Citations omitted.  Emphasis added.)

**5.      Expert opinion may be based upon personal knowledge plus hearsay.**

In *State v. Ecklund*, 30 Wn. App. 313, 633 P.2d 933 (1981), the Court held that an FBI agent was entitled to base his opinion as an expert on laboratory tests conducted by a technician working under his supervision and direction.

In *Le Van v. Dep't. of Labor & Indust,* 18 Wn. App. 13, 16, 566 P.2d 573 (1977), the court said:

> An "expert may state his opinion upon the basis of his personal knowledge plus the testimony he has heard."  (Footnote omitted.)

(Citation omitted.)

Therefore, in *Thornton v. Annest*, 19 Wn. App. 174, 181, 574 P.2d 199 (1978), the court stated regarding expert testimony that:

> Testimony concerning these statements was objected to on grounds they were hearsay statements.  We find no merit in the challenge to this evidenced.  The statements were allowed not to prove their truth, but to form a part of the basis for this opinion.  As such they were not hearsay, but proper as a foundation for his opinion.

(Citation omitted).

**6.      Medical Expenses.**

The reasonable value of necessary health care and treatment expenses are compensable as a separate item of damage.  *Hellman v. Sacred Heart Hospital,* 62 Wn.2d 136, 151, 381 P.2d 605 (1963).

Summaries of evidence are permitted pursuant to ER 1006, which provides as follows:

PLAINTIFFS' TRIAL BRIEF - 19

1
2
3
4

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

5
6
7
8
9
10
11
12
13
14

ER 1006 summaries be admitted as substantive evidence. *State v. Lord*, 117 Wn.2d 829, 856 n.5, 822 P.2d 177 (1991). The proponent of the summary must show that: (1) the original materials are voluminous and an in-court examination would be inconvenient. , (2) the originals are authentic and the summary accurate,); (3) the underlying materials would be admissible as evidence, and (4) the originals or duplicates have been made available for examination and copying by the other parties. *State v. Barnes*, 85 Wn. App. 638, 662, 932 P.2d 669 (1997); 5C Karl B. Tegland, Wash. Prac.: Evid. Law and Prac. § 1006.3, at 271 (4th ed. 1999); 5C Tegland D., *supra* § 1006.3, at 273 (citing *State v. Kane*, 23 Wn. App. 107, 594 P.2d 1357 (1979); *Pollock v. Pollock,* 7 Wn. App. 394, 499 P.2d 231 (1972); ER 1006.

15
16
17
18
19
20
21
22

In the present case the plaintiff has incurred medical expenses which total over $190,000. The sheer volume of the medical billing records are quite voluminous making an in-court examination of each and every bill inconvenient. The summary provided by the Plaintiffs provides an accurate total of the medical expenses incurred by provider and date. Medical bills are admissible in evidence. ER 904; ER 1006; RCW 5.45.020 (Business records). Copies of the medical billings have been provided to the defendant in response to discovery requests.

23
24

Plaintiffs' summary of medical expenses should be admitted for the convenience of the jury and to expedite the trial of this matter.

25

PLAINTIFFS' TRIAL BRIEF - 20

The standard for recovery of past medical expenses requires proof that the care was necessary because of the injuries sustained and that the expense was reasonable. WPI 30.07; *Carr v. Martin*, 35 Wn.2d 753, 761-62, 215 P.2d 411 (1950). "Testimony regarding the necessity for and reasonableness of charges for medical services given an injured party may be presented by any person who has sufficient knowledge and experience in such matters." *Kennedy v. Monroe*, 15 Wn. App. 39, 49, 547 P.2d 899 (1976). "Whether a particular witness has such qualifications is within the trial court's discretion." *Id.* at 50.

Case Managers and Life Care Planners are the professionals who work directly with medical and rehabilitation cost identification; who are consistently researching the costs for current and future medical/rehabilitation treatment and services, equipment and other needs. These professionals understand the intricacies of medical billing practices. It is not uncommon for them to have been retained on the case to provide earning capacity assessments and life care plan coordination. A Case Manager/Life Care Planner is much more intimately involved on a day to day basis with the costs of specific medical procedures and therapies than is a typical physician. They obtain costs and review medical bills as part of their daily work.

Numerous authoritative publications[3] on the practice of Case Managers and Life Care Planners establish that medical bill reviews and testimony regarding the reasonableness of costs is within the purview of the Case Manager/Life Care Planner.

---

[3] Rehabilitation Consultant Handbook by Weed and Field (2001); An Introduction to the Vocational Rehabilitation Process by McGowan and Porter (1967); Guide to Rehabilitation by Deutsch and Sawyer (1999); Life Care Planning and Case Management by Weed (2010); Pediatric Life Care Planning and Case Management by Grisham (2006), Life Care Planning in Light of Daubert and Kuhmo by Weed and Johnson (2006).

PLAINTIFFS' TRIAL BRIEF - 21

These historical, legal and academic foundations, coupled with methodologies that are peer reviewed and accepted in the field, combined with the clinical judgment and experience of the professional Case Manager/Life Care Planner, deem them qualified to opine on the reasonableness of charges for medical services.

In 1967 the publication by McGowan and Porter identified the "coordinator" role of rehabilitation professionals.  In 1984 Deutsch and Raffa further clarified the coordinator role and utilization of these services as life care planners in the litigation setting.  Decades of clinical practice were the underpinning of the rehabilitation professional's specialized knowledge of the costs of medical and rehabilitation services and goods.  Currently there are credentials available for individuals to attain in the areas of Case Management/Life Care Planning.  These certifications include CRC, CCM, CDMS, CLCP, ABVE, CNLCP, and CVE.   Individuals who possess specific educational levels are permitted to sit for the examination and must maintain continuing education.  They have the ability, qualifications and accepted methodologies to present this type of information to the Court.

Plaintiff's expert Case Manager/Life Care Planner is Cloie Johnson, M.Ed., ABVE, CCM.  Her qualifications include being a Registered Vocational Rehabilitation Counselor for the Washington Department of Labor and Industries, a Certified Case Manager and a Diplomate – American Board of Vocational Experts.  As a certified Case Manager and Life Care Planner, Ms. Johnson is qualified to provide testimony regarding the reasonable costs for medical services, supplies, equipment, etc., received by the plaintiff.

In *Kennedy*, the court held as follows:

PLAINTIFFS' TRIAL BRIEF - 22

Proof of special damages need not be unreasonably exacting and may come from any witness who evidences sufficient knowledge and experience respecting the type of service rendered and the reasonable value thereof. **The witness need not be the attending physician or a physician at all, for that matter, so long as he demonstrates the requisite qualifications within the sound discretion of the trial court.**

*Kennedy v. Monroe,* 15 Wn. App. 39, 49-50, 547 P.2d 899 (1976) (emphasis added).

There is nothing new or novel about the concept of a non-physician providing testimony regarding the reasonable cost of medical services. The case law is replete with examples of non-physicians providing such testimony:

"One method of establishing the reasonableness of medical expenses is the testimony of parties having knowledge of the services rendered and the reasonableness of the charges."

*Diaz v. Chicago Transit Auth.,* 174 Ill.3d 405 (1988).

"A party seeking the admission into evidence of a bill that has not been paid can establish reasonableness by introducing the testimony of a person having knowledge of the services rendered and the usual and customary charges for such services."

*Arthur v. Catour,* 216 Ill. 2d 72 (2005).

"The bookkeeper testified sufficiently to qualify as an expert as to the ordinary charges for these medical services rendered, based on her knowledge in this field, including her submission of numerous claims for payment with insurance carriers."

*Bouldin v. Baum,* 134 Ga. App. 484 (1975).

"We believe the superintendent of the hospital, or the financial secretary or bookkeeper of a surgeon having an extensive practice would be as well qualified to express an opinion on the reasonableness of the surgeon's charge, in a given case, as the surgeon himself would be."

*Womack v. Burka,* 206 La. 251 (1944).

"If a witness, by training, study, observation, practice, experience or profession, has acquired knowledge in a particular field beyond that of an ordinary layman, he may be deemed qualified as an expert in that field."

PLAINTIFFS' TRIAL BRIEF - 23

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX: (253) 272-5105

*Aetna Life Ins. Co. v. Hare,* 47 Ala.App. 478 (1972).

To be clear the Plaintiffs' do not intend to elicit testimony from Ms. Johnson regarding the medical necessity for medical treatment. Such medical testimony can only come from a qualified physician. However, as to the reasonable cost of medical treatment deemed necessary by a physician, Ms. Johnson is more than qualified to provide such testimony.

Significantly, the reasonableness and necessity of the medical treatment received by Steve Crow is not disputed by the defendant. The only medical witness disclosed by the defendant is Psychiatrist Michael D. Ward, M.D. In his IME report Dr. Ward states as follows:

> In general, Mr. Crow's mental health treatment, including individual psychotherapy treatment and psychiatric treatment, which involves medical management, **has been reasonable, appropriate and necessary for treatment** of his diagnoses of posttraumatic stress disorder and unspecified depressive disorder that resulted from the exposure incident.

Report of Michael D. Ward, M.D., at Page 99 (emphasis added).

With regard to the amount of the medical expenses incurred by Steve Crow, Dr. Ward states as follows:

> This is outside the scope of this examiner's expertise, and would best be deferred to a medical billing specialist.

Report of Michael D. Ward, M.D., at Page 100.

### 7.    Disability and Disfigurement.

The disability and disfigurement experienced by Steve Crow from September 27, 2012 to the present, and into the future, are compensable as a separate item of damage. *See, e.g., Gray v. Washington Water Power Company,* 30 Wash. 665, 71

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX:  (253) 272-5105

P.2d 206 (1903).

**8.      Physical Pain and Suffering.**

The physical pain and suffering experienced by Steve Crow from September 27, 2012 to the present, and into the future, are compensable as a separate item of damage. *See, e.g., Parris v. Johnson*, 3 Wn. App. 853, 479 P.2d 91 (1970), *Woolridge v. Wollett*, 28 Wn. App. 869, 626 P.2d 1007 (1981).

**9.      Mental Anguish.**

The mental anguish and psychological suffering experienced by Steve Crow from September 27, 2012 to the present, and into the future, is compensable as a separate item of damage.  *See, e.g., Gray v. Washington Power Company, supra.; Johnson v. Howard,* 45 Wn.2d 433, 275 P.2d 736 (1954).

**10.      Impairment of One's Ability to Enjoy Life and its Pleasures.**

Steve Crow may recover for the loss or impairment of his ability and capacity to enjoy life and its pleasures from September 27, 2012 to the present, and into the future. The inability of an injured person to enjoy the noneconomic aspects of certain interests, avocations and vocations is an appropriate and separate factor to consider when assessing damages. *Kirk v. WSU,* 109 Wn.2d 448, 746 P.2d 285 (1987).

**B.      PLAINTIFFS' DAMAGES CLAIMS.**

The damages suffered by the Plaintiffs as a result of the subject exposure incident are significant and pervasive.  In summary, Steve Crow has suffered the following injuries:

Toxic exposure;
Reactive airway disease;
Reactive airway dysfunction syndrome;
Mild bronchiectasis secondary to ammonia exposure;

PLAINTIFFS' TRIAL BRIEF - 25

Right and left eye injury;
Loss of sense of taste and smell;
Damage to tear ducts;
Paranoia;
Confusion;
PTSD;
Major depressive disorder with anxiety;
Vertigo;
Chronic migraines;
Hand strain;
Left thumb contusion and joint capsule injury;
Left great toe fracture;
Abrasion of the left small finger and ring finger;
Left knee pre-patellar bursitis.

As a result of his injuries, Steve Crow has suffered from ongoing vertigo, inability to safely ambulate, drive a vehicle or operate a machine, confusion, migraines, permanent lung damage, fatigue, lack of stamina, anxiety attacks, post-traumatic stress disorder, severe depression and anger and suicidal ideation.

Mr. Crow has been unable to return to work following the subject exposure incident. It is fairly apparent that Mr. Crow will never return to any type of work due to the severity of his injuries. At the time of the subject exposure Mr. Crow was 53 years old and planned to work at least through his 67th birthday. He has suffered a significant amount of lost wages to date and has suffered a total impairment of his earning capacity as set forth in the report of Plaintiffs' economist.

Mr. Crow has gained 100 pounds since this incident, suffers from many "falls" when attempting to ambulate and generally refuses to go out into public areas given his severe vertigo, confusion, difficulty ambulating and shortness of breath. He has not driven a vehicle since 2012 and is dependent on his wife for all his needs. The Plaintiffs reside on a 25 acre parcel of property and had been planning for several years on building a new home. Prior to the subject exposure the Plaintiffs purchased a kit for a

RUSH, HANNULA, HARKINS & KYLER, L.L.P.
4701 South 19th Street, Suite 300
TACOMA, WA  98405
TELEPHONE: (253) 383-5388
FAX:  (253) 272-5105

new home and had the blue prints completed but they have not been able to take any further action.

In addition, the Plaintiffs have suffered a loss of Cheryl Crow's income as a registered nurse since the subject exposure. Mrs. Crow has been a registered nurse for 17 years at Grays Harbor Hospital. Before the subject exposure she worked part time, working three 8-hour shifts per week. In 2011 her income was $44,948.00 and she was earning $41 per hour. She has continued to get raises and currently earns $47.00 per hour but her income is much less. She has recently been offered full time employment at the hospital but cannot accept it given the care she needs to provide for her husband since his exposure.

Mrs. Crow has had to use all of her vacation, sick leave and personal days (5 weeks paid vacation, 1 week paid sick leave, FMLA time) for purposes of caring for her husband and coordinating his medical care and she has been reprimanded for missed work due to the time this entails. In addition to using all of her paid benefits and unpaid FMLA benefits, she has still had to get other co-workers to cover her missed shifts. In 2013, the year following her husband's exposure, Mrs. Crow earned $34,279.66, which is $10,668.34 less than she earned in 2011, the year preceding his exposure. This is despite the fact that she earns $5.00 per hour more than she did in 2011. If Cheryl Crow did not provide the care and coordination of medical treatment for her husband that he now needs, her wage loss may be less but the care costs for Mr. Crow would be substantially greater.

The Plaintiffs, who have been married for 36 years, have 8 children, 3 of whom are adopted and still reside in the family home. Cheryl Crow and her children have

PLAINTIFFS' TRIAL BRIEF - 27

suffered significant damage and impairment to their relationships with their father as a result of this incident.  Following the subject exposure, Mr. Crow has suffered from significant sexual dysfunction along with migraines and vertigo.  His sexual dysfunction is complicated by all of his other incident-related physical problems and the corresponding depression, anger and volatility resulting therefrom.  Mr. Crow is frequently emotionally volatile, angry and depressed.  All of these issues have severely impaired any intimate relations between the Plaintiffs.

Cheryl Crow's role in the marriage has gone from wife to caretaker.  She spends 20 to 24 hours per day with Mr. Crow including taking him to all of his medical appointments, coordinating his medical care including breathing therapy and administering his many medicines and providing moral support. Since the subject exposure Mr. Crow has been unable to interact physically or emotionally with Cheryl Crow or his family and he needs constant encouragement to participate in any family interaction.  Cheryl Crow's interaction with Mr. Crow since this incident is based almost entirely on the 1:1 care that she must now provide to him.  Mr. Crow is severely depressed and Cheryl must keep all of his medications locked up and away from him as he has been suicidal.  In short, Cheryl Crow's interactions with her husband and the quality of their time together since the subject exposure have been significantly impaired and are in stark contrast to what it was before this incident.

Prior to the subject exposure Steve Crow coached all of his children in local community sports leagues and was voted "Coach of the Year" on many occasions.  He is very well known in his community as being a wholesome family man who is extremely active in his community with his family and other volunteer activities.  Family and

PLAINTIFFS' TRIAL BRIEF - 28

community activities were his life and he was an avid camper, traveler, fisherman, hunter, participant in all of his children's extracurricular and sporting events; family holidays and events (including his 8 children and – grandchildren). Since the subject exposure he has become severely depressed due to his health condition and inability to participate in anything he used to prior to the incident. After walking 30 to 40 feet Mr. Crow has to stop, lean on his cane and catch his breath. During episodes of vertigo he can walk only 5 feet without stopping. The vertigo and migraines cause panic and then anger. Mrs. Crow spends 20 to 24 hours per week taking Steve Crow to doctor visits and helping administer his multiple medications.

Prior to the subject exposure Mr. Crow was extremely close to all of his children and participated in all of their extracurricular and sporting activities, including serving as the coach for their sporting teams. Prior to the subject exposure he never missed an event or competition for any of the kids. Following the subject exposure Mr. Crow has distanced himself from the children and no longer participates in their athletics, school functions, school work or any of their achievements. He also no longer has any physical contact with the children and no longer is the mentor and role model to them that he was prior to this incident.

The Plaintiffs' marriage has suffered immensely as a result of Mr. Crow's inability to interact physically or emotionally with his wife or other family members. He is severely depressed and volatile with angry outbursts and has dealt with multiple instances of suicidal ideation as a result of his health conditions to the point that he has been admitted on an inpatient basis for these incidents. Mr. Crow has panic attacks and severe nightmares of being trapped inside a small space and not being able to

PLAINTIFFS' TRIAL BRIEF - 29

breathe and he has nightmares of the actual incident.  Mr. Crow worries about whether the subject exposure will cause cancer in the future.

Mr. Crow has permanent lung damage (i.e. reactive airway disease; reactive airway dysfunction syndrome and mild bronchiectasis secondary to anhydrous ammonia exposure); Vertigo and headaches; Confusion; Paranoia; Anger; Lost sense of both smell and taste; chronic orthopedic injuries from flailing and kicking in an attempt to get out of the vehicle on the date of this incident. It is extremely difficult to attempt to incorporate all ways in which this incident and its repercussions have impacted Steve Crow and his entire family.  With regard to Cheryl Crow's lost earnings/income, that loss will continue to the extent that she needs to continue providing the care and coordination of her husband's medical care as she has done since his exposure.

Plaintiffs' expert Economist and Life Care Planner have determined the following special damages that have been suffered by the Plaintiffs:

| | | |
|---|---|---|
| Medical Expenses to date: | $ | 193,625.00 |
| Wage Loss to Date: | $ | 193,966.00 |
| Future Economic Damages: | $ | 369,416.00 |
| Life Care Plan: | $ | 930,903.00 |
| **TOTAL:** | | **$1,687,910.00** |

////

////

////

////

////

////

PLAINTIFFS' TRIAL BRIEF - 30

1

## VI.  CONCLUSION

2

At the trial of this matter the jury will need to determine both liability for the

3

subject exposure incident and the injuries and damages suffered by the Plaintiffs.

4

DATED this 18th day of July, 2017.

5

s/*Michael J. Fisher*

6

Michael J. Fisher, WSBA #32778
Rush, Hannula, Harkins & Kyler, LLP

7

4701 So. 19th St., #300
Tacoma, WA 98405

8

Phone:        253-383-5388
Fax:            253-272-5105

9

E-Mail:       mfisher@rhhk.com

10

s/*Daniel R. Kyler*
Daniel R. Kyler, WSBA #12905

11

Rush, Hannula, Harkins & Kyler, LLP
4701 So. 19th St., #300

12

Tacoma, WA 98405
Phone:        253-383-5388

13

Fax:            253-272-5105
E-Mail:       dkyler@rhhk.com

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' TRIAL BRIEF - 31

**CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2017, I caused to be served a copy of the foregoing:

(1) Plaintiffs' Trial Brief.

on the following persons in the manner indicated below at the following address(es):

| | |
|---|---|
| Tamara S. Clower<br>Gary M. Clower<br>Tacoma Injury Law Group, Inc. P.S.<br>3848 S. Junett Street<br>Tacoma, WA 98409<br>Phone: (253) 472-8566<br>Fax: (253) 475-1221<br>Email: tammy@tacomainjurylawgroup.com<br>        gary@tacomainjurylawgroup.com | John G. Fritts<br>W. Sean Hornbrook<br>Wilson Smith Cochran Dickerson<br>901 Fifth Avenue, Suite 1700<br>Seattle, WA 98164<br>Phone: (206) 623-4100<br>Fax: (206) 623-9273<br>Email: fritts@wscd.com<br>        hornbrook@wscd.com |
| _X_   by CM/ECF<br>___   by ABC/Process Service<br>___   by Facsimile Transmission<br>___   by First Class Mail<br>___   by Hand Delivery<br>___   by Overnight Delivery<br>___   by Email | _X_   by CM/ECF<br>___   by ABC/Process Service<br>___   by Facsimile Transmission<br>___   by First Class Mail<br>___   by Hand Delivery<br>___   by Overnight Delivery<br>___   by Email |

Signed at Tacoma, Washington this 18th day of July, 2017.

Vea Steppan.

RUSH, HANNULA, HARKINS & KYLER, L.L.P.<br>4701 South 19th Street, Suite 300<br>TACOMA, WA  98405<br>TELEPHONE: (253) 383-5388<br>FAX:  (253) 272-5105