HONORABLE ROBERT J. BRYAN
Trial Date: July 24, 2017

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| STEVEN CROW and CHERYL CROW, individually and as husband and wife, and Plaintiff CHERYL CROW on behalf of and as parent and guardian of J.M.C., J.J.C., and G.E.C., a minors,<br><br>Plaintiffs,<br><br>vs.<br><br>COSMO SPECIALTY FIBERS, INC., a Delaware Corporation; TRANS-SYSTEM, INC., an Indiana corporation d/b/a JAMES J. WILLIAMS BULK SERVICE TRANSPORT; AIRGAS SPECIALTY PRODUCTS, INC., a Delaware corporation, "JOHN DOE AND JANE DOE ONE," Individually and as husband and wife; "JOHN DOE TWO COMPANY", an as of yet unknown company, partnership or individual,<br><br>Defendants. | No. 15-05665 RJB<br><br>**DEFENDANTS TRANS-SYSTEM, INC.'S AND JAMES J. WILLIAMS BULK TRIAL BRIEF** |



WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### I. Introduction/Background

Plaintiff Steve Crow and his experts have changed their testimony and opinions in this matter regarding what time the subject incident occurred and what gas/odor from the Cosmo Specialty Fibers, Inc. ("Cosmo") pulp mill facility that Mr. Crow was exposed to so many times that it has been exceptionally difficult for Defendants Trans-System, Inc. ("TSI") d/b/a James J. Williams Bulk Service Transport ("JJW") to keep up with and defend. Mr. Crow's original claim was that he was exposed to an "unknown gas," sometime after 3:00 p.m. on September 27, 2012. In fact, Mr. Crow reiterated this position multiple times during his July 12, 2016 deposition, indicating that he actually thought the incident occurred as late as 3:45 p.m. He never once claimed the incident occurred any time before 3:00 p.m. Then, on August of 2, 2016, plaintiff suddenly changed his sworn deposition testimony to then claim—for the first time in four years—that the incident occurred before 2:00 p.m., instead of after 3:00 p.m. Mr. Crow still did not know what the gas/odor was.

Also in August of 2016, plaintiff's pulmonology expert issued a report opining and concluding that Mr. Crow was exposed to "a large quantity of anhydrous ammonia" gas, even though Mr. Crow has never described the gas/odor as smelling like the very distinct odor of ammonia. Then, most recently in May of 2017—less than a month prior to our original trial date—plaintiff produced a new report from his pulmonology expert containing a completely new opinion. Now, for the first time since November of 2012, plaintiff's pulmonology expert

DEFENDANTS TRANS-SYSTEM, INC.'S AND JAMES J. WILLIAMS BULK SERVICE TRANSPORT'S TRIAL BRIEF (Cause No. 15-05665 RJB) – 2

wsh / WSH / 6624.010 / 2621662_1

WILSON SMITH COCHRAN DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

claims that Mr. Crow was exposed to <u>liquid</u> aqua ammonia without offering any explanation for this significant change of opinion and untimely disclosure.[1]

However unfortunate and plainly obvious this has been for TSI-JJW over the course of this matter, it will soon become equally apparent to this Court and the jury that whenever plaintiffs discover facts that conflict with or contradict their testimony and expert opinions, plaintiffs simply change their testimony and expert opinions, as opposed to following the facts to the actual source of the gas/odor emanating from the Cosmo facility that day.

Rather than following the fact the Weyerhaeuser workers, Weyerhaeuser investigative report, Cosmo's initial letter regarding the event, Mr. Crow, Mr. Coon, Mr. Crow's medical and employment records, and Mr. Coon's benefit application form, all indicate that the incident occurred after 3:00 p.m. and trying to figure out what the actual gas/odor could have been, plaintiff instead changes his testimony to claim it happened over an hour earlier than he has ever said in four years.  Rather than following the fact that all eyewitnesses claim the gas/odor came from the Cosmo facility in the area near the truck shop and attempting to determine what the possible sources could be in that area, plaintiff engages in almost no discovery with Cosmo, and does not note a single deposition during the entire course of this matter.  Rather than following the fact that Cosmo's ParcView records obtained only through the continued discovery efforts of TSI-JJW irrefutably confirm that there was a three-minute Sulfur Dioxide (SO2) emission spike at the Weyerhaeuser truck shop at 3:02 p.m. that day, plaintiff instead represents to this Court—and soon the jury—that discovery uncovered no

---

[1] Anhydrous Ammonia/ammonia gas (NH3) is pure ammonia gas and is classified as an extremely hazardous substance in the U.S. (42 U.S.C. 10002). Aqua Ammonia/ammonia water (19%) is a solution made up of 81% water and 19% ammonia, and though considered a hazardous material, is not considered extremely hazardous.

DEFENDANTS TRANS-SYSTEM, INC.'S AND
JAMES J. WILLIAMS BULK SERVICE
TRANSPORT'S TRIAL BRIEF (Cause No. 15-
05665 RJB) – 3
wsh / WSH / 6624.010 / 2621662_1

WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

possible source of the gas/odor from Cosmo that afternoon and that Cosmo's ParcView data recorded absolutely nothing in this regard.

Rather than following all of the above-referenced facts to get to the truth, plaintiffs elect to ignore them, and instead claim the incident occurred over an hour earlier than the Mr. Crow and the Weyerhaeuser workers reported, and then further allege it involved an <u>empty</u> JJ Williams tanker trailer that never came within a football field of where Mr. Crow claims he was located when the incident occurred.

## II.  Statement of Facts

A.  <u>The Incident</u>

Shortly after 3:00 p.m. on September 27, 2012, four Weyerhaeuser workers—Steve Crow, Marvin Coon, Glen Caba, and Dave McCullough—experienced a strong gas/odor release from the adjacent Cosmo pulp mill facility.  At the time, they were located just outside a bay door of the Weyerhaeuser truck shop that is located adjacent to the Cosmo facility.  A fifth worker, Kandi Johnson, was located inside the truck shop and also smelled the gas/odor, but to a lesser extent.  Within a matter of minutes Kandi telephoned Cosmo personnel reporting the incident and also notified her supervisor, Karen Temen, who was offsite that day.  Karen then emailed Cosmo's Safety and Health Director Donna Parsons to report the incident at 3:17 p.m.  All witnesses with personal knowledge agree that this was within 10-15 minutes of Cosmo's actual gas/odor emission that afternoon.

Donna Parson's then looked into the incident reported by Weyerhaeuser and claimed she was unable to locate any "upset conditions," other than the Hog Fuel Boiler line leaking wood dust.  Ms. Parson's then called Ms. Temen to report her findings in this regard, which

DEFENDANTS TRANS-SYSTEM, INC.'S AND JAMES J. WILLIAMS BULK SERVICE TRANSPORT'S TRIAL BRIEF (Cause No. 15-05665 RJB) – 4
wsh / WSH / 6624.010 / 2621662_1

WILSON SMITH COCHRAN DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

Ms. Temen then relayed back to Kandi and the others via email at 3:55 p.m. that same afternoon.

The following morning, on September 28, some of the Weyerhaeuser workers were complaining of symptoms including difficulty breathing and a strong odor they were unable to describe, but could still "taste it."  Ms. Temen sent an email to Ms. Parsons that day regarding Cosmo's "pulp mill gas leak" and reporting the workers' symptoms.  Ms. Parsons then forwarded Ms. Temen's email to Cosmo Environmental Engineers Arne Peterson and Craig McKinney, as well as Mill Manager Jim Smith.  Mr. Smith responded to Ms. Parson's email almost immediately asking what time the incident happened the day before.  Ms. Parsons then forwarded Mr. Smith the 3:17 p.m. email from Ms. Temen the day before indicating that the email is the report that came in that afternoon, which Ms. Parson's claimed she investigated, but found nothing.

B.  Cosmo's Sulfur Dioxide (SO2) Release

Shortly after 3:00 p.m. on September 27, 2012, there was a significant release of Sulfur Dioxide from Cosmo at the Weyerhaeuser truck shop.  A release that was a minimum of 70x (4.19 ppm) the average SO2 emission reading (.06 ppm) for the 24-hour period that day, and a minimum of nearly three times the Short Term Exposure Limit (STEL) for SO2 (.25 ppm).[2]  Because Cosmo's ParcView emissions analysis software only records ppm levels in one minute intervals, the ppm number recorded is a weighted average recorded over the 60 seconds, or one minute period.  As such, it is very likely that SO2 ppm level was much higher than 4.19 at its peak emission level the afternoon of the exposure.

---

[2] *See* Ex. A-7, WY_2CROW 00220 (Working Safely with Sulfur Dioxide).

WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

Sulfur Dioxide is an extremely toxic gas with a very pungent smell that people find difficult to describe.[3]   As noted by the CDC, detection levels are very low for most individuals at a mere .3 to 1 parts per million (ppm) and is <u>mainly by taste</u>:

> The <mark>average individual is able to detect 0.3 to 1 part per million (ppm) mainly by taste</mark>, 3 ppm by odor, and 6 ppm by immediate <mark>sharp irritation of the nose and throat</mark>. Concentrations of 20 ppm can cause an immediate irritation to the eyes (Daum and Stellman, 1973).[4]

The CDC/NIOSH go on to state that sulfur dioxide is <u>so intensely irritating</u> that workers "run for their lives" to escape its effects:

> <mark>Severe acute gassing accidents are rare because</mark> sulfur dioxide is <mark>so intensely irritating that workers run for their lives to escape from its effects</mark>. Workers in atmospheres fairly[5]

Workers "running for their lives" to escape an odor they were incapable of describing that was more of "a taste" is precisely what occurred during the incident that is the subject of this matter.

Notably, and unfortunately, both Cosmo and the plaintiffs have represented to this Court and the other parties in this matter that they reviewed the ParcView emissions data for September 27, 2012 and found nothing out of the ordinary.[6]  Most recently, in plaintiffs' May 19 response to TSI-JJW's motions in limine, they represented to the Court that the only upset condition noted at the Cosmo facility that day was the Hog Fuel boiler mentioned by Ms. Parsons.  Plaintiffs further represented that Cosmo's "ParcView data showed no gas leaks,

---

[3] https://www.cdc.gov/niosh/pdfs/79-116-f.pdf *Sulfur Dioxide*, Centers for Disease Control and Prevention (CDC) and National Institute of Occupational Safety and Health (NIOSH).
[4] *Id.*
[5] *Id.*
[6] *See* Dkt. 78, Cosmo's Motion for Summary Judgment; *see also* Dkt. 113, Plaintiffs' Response to TSI-JJW Motions in Limine.

DEFENDANTS TRANS-SYSTEM, INC.'S AND
JAMES J. WILLIAMS BULK SERVICE
TRANSPORT'S TRIAL BRIEF (Cause No. 15-
05665 RJB) – 6
wsh / WSH / 6624.010 / 2621662_1

WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

exposures, or alarm sounds for any other chemical."[7]  Plaintiffs also never told any of their experts about the significant SO2 emission that occurred at the truck shop precisely when the eyewitnesses all claim the exposure occurred.

It is very concerning that plaintiffs are now admitting—for the very first time—that they previously reviewed Cosmo's ParcView data, saw the SO2 spike at the truck shop at the same time the 3:00 p.m. incident occurred (again a minimum of 70x the average SO2 reading that day and a minimum of nearly three times the allowable STEL for SO2), yet are somehow comfortable representing to the Court that the ParcView data recorded nothing out of the ordinary with no gas leaks or exposures that day.  Given the admission of this knowledge, one would think there is surely a good faith difference between admitting the ParcView SO2 spike data recording and attempting to minimize it, as opposed to outright representing that it does not exist and did not even occur.

C.  JJ Williams

One constant in this matter is that JJ Williams exited Cosmo's pulp mill facility no later than 1:46 p.m. on the day of the incident, over an hour before the Weyerhaeuser workers experienced the gas/odor emission.  Both parties and all experts agree that JJ Williams cannot be the source of any exposure incident that occurred over and hour later.

All available testimony and records confirm that the incident was reported to Cosmo within minutes of the workers experiencing Cosmo's gas/odor leak and that Karen Temen reported the incident to Cosmo's Donna Parson's in the 3:17 p.m. email.  Although this alone should be enough to demonstrate that TSI-JJW had absolutely nothing to do with whatever

---

[7] Dkt. 113.

WILSON SMITH COCHRAN DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

happened to the plaintiff that day, it is perhaps equally important to emphasize that the JJ Williams tanker trailer <u>was empty</u> of it liquid product when it traveled through the Cosmo facility at approximately 1:30 p.m. that day. All of its liquid 19% aqua ammonia had been completely offloaded. At most, there was approximately 1-2 PSI of residual compressed air remaining in the tanker trailer from the offloading process.

1-2 PSI of residual compressed air is not a "hazardous material" and transporting it within a restricted access pulp mill facility is not an abnormally dangerous activity under Washington law.

D. <u>Expert Opinions</u>

All experts in this matter agree that the TSI-JJW delivery occurring before 1:46 p.m. on September 27, 2012 cannot be the source of the gas/odor Mr. Crow experienced after 3:00 p.m. that day. Certified Industrial Hygienist, Stephanie Carter, Ph.D., and transportation safety expert, Richard Carr, Ph.D., both reviewed the deposition transcripts of Cosmo Environmental Engineers Arne Peterson and Craig McKinney, as well as the deposition transcript and report of Plaintiffs' Certified Industrial Hygienist, Doug Henry. Drs. Carter and Carr attest and opine that they agree with the opinions of Mr. Peterson, Mr. McKinney, and Mr. Henry that any residual compressed air released from the JJ Williams Tanker trailer would not remain in the atmosphere for an hour or more.[8]  Indeed, Dr. Carter opines that any residual compressed air on the day of the incident would have passed through any given location within about two minutes after the end of the tanker trailer venting.

---

[8] *Id.*

DEFENDANTS TRANS-SYSTEM, INC.'S AND
JAMES J. WILLIAMS BULK SERVICE
TRANSPORT'S TRIAL BRIEF (Cause No. 15-
05665 RJB) – 8
wsh / WSH / 6624.010 / 2621662_1

WILSON
SMITH
COCHRAN
DICKERSON

901 Fifth Avenue, Suite 1700
Seattle, Washington 98164
Telephone: (206) 623-4100
Fax: (206) 623-9273

Additionally, regardless of what time the JJ Williams tanker venting occurred, mathematical modeling indicates that the potential ammonia concentrations in the atmosphere that day would have been well below those considered a risk to the community or to a worker downwind of the release point.   According to Dr. Carter, "mathematical modeling is a common technique within the industrial hygiene profession used to estimate exposure concentrations both prospectively and retrospectively."   In fact, "the Environmental Protection Agency requires the use of mathematical models to assess the impact of chemical releasess outside a facility's fence line, including both worst case as well as 'more likely' alternative release scenarios."   Furthermore, accepted mathematical modeling techniques confirm that that even when using a worse case assumption, it did not predict an ammonia exposure as a health risk to even the most susceptiable individuals, let alone someone like Mr. Crow who is not susceptible.

The bottom line is that all original reports from eyewitnesses confirm that Cosmo's gas/odor leak occurred sometime around 3:00 p.m., over an hour after the JJ Williams tanker trailer left Cosmo's facility.   There is also no dispute that all experts agree that the JJ Williams delivery cannot be the source of any exposure occurring over an hour later.   Furthermore, plaintiff and Cosmo's misrepresentations to the contrary, Cosmo's ParcView emission data record a significant SO2 spike at the Weyerhaeuser truck shop shortly after 3:00 p.m., precisely when the worker reported that Cosmo's gas leak occurred.   SO2 is notably described more by taste than by odor and is so toxic and intensely irritating that it is known to send workers for cover.   This is precisely how the workers described and reacted to Cosmo's gas leak shortly after 3:00 p.m. that afternoon.

WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

At the conclusion of the presentation of the testimony and evidence, it will be clear that there is only one company to blame for the gas leak that day.  The company that failed to disclose even the existence of its ParcView facility emissions data monitoring system.  The company that failed to disclose to Weyerhaeuser that there was a significant SO2 spike at the truck shop at precisely the time the workers claim they were exposed.  The company that initial claimed that its employees and records confirmed that the Weyerhaeuser workers reported that the exposure occurred around 3:00 p.m., to only then later claim it occurred an hour earlier.  The company that claimed that a server failure caused them to lose much of the data and email associated with the subject incident, to only then quickly and suddenly "find" some of the missing data and emails when faced with a motion for spoliation sanctions.  Put plainly and simply, that company is Cosmo Specialty Fibers, Inc.

### III.  Legal Issues

Plaintiffs have two remaining causes of action at trial: 1. Common law negligence; and 2. Strict liability.[9]  Plaintiffs properly bear the burden of proof with respect to each claim.

A.  <u>Negligence</u>

Negligence requires the plaintiff to prove that (a) the defendant owed a duty to the plaintiff, (b) the defendant breached that duty, (c) there was resulting damages, and (d) the defendant's breach was the proximate cause of the damages.[10]  "Negligence is never presumed but must be established by a preponderance of the evidence…" and "…the fact that an accident occurred does not in and of itself establish negligence."[11]

---

[9] Plaintiffs' claims for negligent hiring, training, and supervision were dismissed on TSI-JJW's motion for summary judgment.
[10] *Tallariti v. Kildare*, 63 Wn. App. 453, 456-57, 820 P.2d 952 (1991).
[11] *Gordon v. Deer Park Sch. Dist. No. 414*, 71 Wn.2d 122, 426 P.2d 824 (1967).

DEFENDANTS TRANS-SYSTEM, INC.'S AND
JAMES J. WILLIAMS BULK SERVICE
TRANSPORT'S TRIAL BRIEF (Cause No. 15-
05665 RJB) – 10
wsh / WSH / 6624.010 / 2621662_1

WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

At trial, plaintiffs Crow will be unable to establish the four essential elements of negligence against TSI-JJW, all of which much be proven by a preponderance of the evidence. Failure to meet their burden with respect to even one of the four essential elements is necessarily fatal to plaintiffs' cause of action.

At trial, the plaintiffs will be unable to put forth any testimony or evidence that TSI-JJW actually breached a duty of care owed to them, let alone that any alleged breach was actually a proximate cause of the subject incident resulting in plaintiffs' claimed injuries and damages.[12] Proximate cause includes both cause-in-fact and legal cause.[13] "Cause-in-fact is a cause but for which the accident would not have happened."[14] "Cause-in-fact may be determined as a matter of law if the causal connection is so speculative or indirect that reasonable minds could not differ."[15] However, legal cause "depends upon whether a defendant's conduct should warrant legal liability as a matter of social policy **and common sense**."[16]

In the case at hand, the preponderance of the evidence demonstrates that the JJ Williams tanker trailer was not even present around 3:00 p.m. when the subject incident occurred. Even assuming it was in the area, the tanker trailer was empty of its liquid product at the time. At most, it contained 1-2 PSI of residual compressed air remaining from the offloading process. Furthermore, the tanker trailer never came closer than over a football field away from where Mr. Crow claims he was located at the time he smelled the gas/odor coming from Cosmo's facility.

---

[12] *See Doherty v. Municipality of Metro. Seattle*, 83 Wn. App. 464, 469, 921 P.2d 1098 (1996).
[13] *Doherty*, 83 Wn. App. at 469.
[14] *Id*. (*citing Channel v. Mills*, 77 Wn. App. 268, 272, 890 P.2d 535 (1995)).
[15] *Id*.; *See also Walters v. Hampton*, 14 Wn. App. 548, 555-56, 543 P.2d 648 (1975).
[16] *Id*. (*emphasis added*); *See also Taggart v. State*, 118 Wash.2d 195, 225-26, 822 P.2d 243 (1992).

WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

Additionally, plaintiffs have no experts who performed any calculations regarding any alleged concentration of any ammonia purportedly remaining in the tanker trailer's 1-2 PSI of remaining residual compressed air.  Plaintiffs did have one Certified Industrial Hygienist expert who attempted to accepted modeling techniques in an attempt to determine the likely concentration levels Mr. Crow may have been exposed to, but <u>no matter how hard he tried and no matter what aggressive assumptions he attempted to make in favor of Mr. Crow's exposure, he was simply unable to reach a significant enough concentration ammonia that would result in symptoms similar to those Mr. Crow reported</u>.  So what did plaintiffs' expert do with his failed modeling equation scenarios?  He threw them out, because he could not force them to match Mr. Crow's claims.[17]   It might have helped if someone would have provided him with the ParcView SO2 release data rather than keeping it from him.

The bottom line is the very basic and important fact that the JJ Williams tanker trailer left Cosmo's facility around 1:46 p.m., which is well before the time Mr. Crow originally claimed the incident occurred.  The time that Mr. Crow continuously and repeatedly maintained for four years up to and including several times during his July 2016 deposition.  It was only after his deposition when he learned that it was impossible for the JJ Williams tanker to be the source of the gas/odor at the time he reported it occurred that Mr. Crow made the conscious decision to change his claim for the first time in four years.  It was then that Mr. Crow told his best friend, Marvin Coon, that he knew that he was under oath when he testified that the incident at the original time he always claimed it had, but that "he did not care that he was under oath and was changing his testimony anyway."  The only way Mr. Crow could

---

[17] It is notable that the plaintiffs are no longer calling this expert as a witness following his deposition and admissions in this matter.



WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

keep TSI-JJW in this case was to claim that the incident occurred at a time he had never previously claimed.  And that is precisely what he did. before then suddenly changing his claim regarding the time only after.

Separate and apart from Mr. Crow changing his testimony, it is equally important to note that Mr. Crow is unable to put forth any competent admissible testimony with adequate foundation to establish that the empty JJ Williams tanker with 1-2 PSI of residual compressed air was the source of Mr. Crow's exposure on a more probable than not basis to a reasonable degree of certainty.  None of Mr. Crow's experts have disclosed or put forth any qualified expert opinion testimony to establish that they have done any calculations regarding the likely or even the potential concentration of ammonia in the 1-2 PSI of residual compressed air in the tanker trailer, let alone establishing a causal nexus between the venting of the residual compressed air and the severely extreme nature of Mr. Crow's reported symptoms.

Simply put, plaintiffs will be unable to establish the essential negligence elements of breach and cause/proximate cause through competent admissible evidence by a preponderance of the evidence at the time of trial.

B.  Strict Liability

Although Washington Courts recognize the doctrine of strict liability, it is not automatically applied merely because a defendant is handling a hazardous material.[18]  What is controlling is whether an activity is "abnormally dangerous," which is a question of law.[19] Six factors are considered in determining whether an activity is abnormally dangerous:

> (a) existence of a high degree of risk of some harm to the person, land or chattel of others;

---

[18] *See Anderson v. Tech Metals, Ltd.*, 2015 U.S. Lexis 1035, *14-15.
[19] *Id.*, *15.

DEFENDANTS TRANS-SYSTEM, INC.'S AND
JAMES J. WILLIAMS BULK SERVICE
TRANSPORT'S TRIAL BRIEF (Cause No. 15-
05665 RJB) – 13
wsh / WSH / 6624.010 / 2621662_1

WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous
attributes.[20]

Although not all six factors must be met in order for strict liability to apply, "the essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with reasonable care."[21]   The Supreme Court noted that "…[A]t least one factor must among (a), (b), and (c)… must generally be present. And at least one factor among (d), (e), and (f) must also be present."[22]

Plaintiffs must do more than merely allege that the strict liability should apply simply because aqua ammonia is considered a hazardous material.  Again, it is a solution of 81% water and 19% ammonia, as opposed to the pure 100% anhydrous ammonia gas.[23]  Although there is some degree of risk of risk transporting and/or handling aqua ammonia—like almost any chemical—there is not a "high degree" of risk where it is only poisonous if someone is exposed to a high concentration for a very extended period of time as will be attested to by Dr. Carter.  Furthermore, the JJ Williams tanker trailer was located on a restricted access private pulp mill facility.  The concentration of the solution is very low and the risk that someone would be exposed to a high enough concentration for a long enough period of time to be harmed without the ability to move to a safe zone is exceedingly low.

---

[20] *Id.*(*citing Restatement (Second) of Torts § 520* (1977)).

[21] *Id.*,*15-16(*quoting Restatement (Second) of Torts § 520, cmt. f* (1977)).

[22] *Stout v. Warren*, 176 Wn.2d 263, 271, 290 P.3d 972 (2012)(*citing Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 8, 810 P.2d 917 (1991).

[23] Neither OSHA nor the EPA lists aqua ammonia as a hazardous material or a controlled chemical requiring special regulations to maintain safely.

DEFENDANTS TRANS-SYSTEM, INC.'S AND
JAMES J. WILLIAMS BULK SERVICE
TRANSPORT'S TRIAL BRIEF (Cause No. 15-
05665 RJB) – 14
wsh / WSH / 6624.010 / 2621662_1

WILSON
SMITH
COCHRAN
DICKERSON

901 Fifth Avenue, Suite 1700
Seattle, Washington 98164
Telephone: (206) 623-4100
Fax: (206) 623-9273

Here, again, the defendants' alleged activity occurred on a restricted access private pulp mill facility and the magnitude of any potential harm was minimal and there is no "high degree" of risk present as contemplated by the Restatement factors.   As explained by Dr. Carter, exposure to 25 ppm of aqua ammonia—levels well above those even possible here—are permissible for a period of 8 hours at a time according to the American Conference of Governmental Industrial Hygienists and Washington State Regulations.

Furthermore, members of the public, including those most susceptible—which Mr. Crow was not—could be exposed to up to 220 ppm for 30 minutes without risk of prolonged health effects.   This is well over 20x the ppm level Mr. Crow could possibly have been exposed to for less than the 10 minutes he claims using even the most liberal of calculations in his favor.   In viewing the above-reference facts in the context of the Restatement factors, it can hardly be argued that the empty JJ Williams tractor trailer traveling through Cosmo's restricted access pulp mill facility while containing only 1-2 PSI of residual compressed air after offloading all of its aqua ammonia is an abnormally dangerous activity invoking the doctrine of strict liability.

The bottom line, as attested to by Certified Industrial Hygienist, Dr. Carter, assuming the worse case exposure concentration based on the available facts present here, and using accepted mathematical modeling techniques, results in a concentration level well below that considered a risk downwind to even the most susceptible in the community.

## IV. Conclusion

There is no dispute that no witnesses with actual personal knowledge allege that Ammonia and/or TSI-JJW was the source of Mr. Crow's alleged exposure.   There is no dispute that the TSI-JJW delivery completed by 1:46 p.m. cannot be the source of Crow's

WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

originally reported exposure given the timing.  There is no dispute that for four years following the incident, Plaintiff Crow consistently reported, represented, and maintained that the incident actually occurred sometime after 3:00 p.m., including during his deposition in this matter.  There is also no dispute that after his deposition—and only after learning that an exposure any time after 3:00 p.m. was necessarily fatal to all of his claims against Defendants TSI-JJW—that Plaintiff Crow attempted to change his testimony to allege the incident occurred before 2:00 p.m.  This is well over an hour before any time he had ever claimed or previous reported to anyone.  In doing so, Plaintiff Crow told his good friend that he knew he testified to 3:45 p.m. at his deposition, knew he was under oath, and that he did not care.  He was changing his testimony anyway.

Although Mr. Crow will no doubt do his best to explain the sudden change in his testimony regarding the timing of the subject incident during litigation in this matter, he will perhaps more importantly be unable to explain why he elected not to pursue claims against Cosmo where he was aware of the ParcView data recording a significant emission of the very toxic and hazardous $SO_2$ gas at the precise time and location that all eyewitnesses originally reported Cosmo's gas leak occurred.  An $SO_2$ gas release that was 70x the average ppm reading for that day and nearly 3x the allowable STEL limit for $SO_2$ that resulted in reported symptoms identical to those caused by even a short term exposure to $SO_2$ gas at the recorded ppm concentration.

The evidence and testimony at trial will establish that Cosmo was negligent and/or strictly liable for the 3:00 p.m. $SO_2$ release on September 27, 2012 and that Cosmo is liable for any injuries and damages proximately flowing therefrom.

DEFENDANTS TRANS-SYSTEM, INC.'S AND
JAMES J. WILLIAMS BULK SERVICE
TRANSPORT'S TRIAL BRIEF (Cause No. 15-
05665 RJB) – 16
wsh / WSH / 6624.010 / 2621662_1

WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

1

2      DATED this 20th day of July, 2017.

3

4

5                              **WILSON SMITH COCHRAN DICKERSON**

6                              *s/ W. Sean Hornbrook*
                               _____
7                              W. Sean Hornbrook, WSBA No. 31260
                               901 Fifth Avenue, Suite 1700
8                              Seattle, WA  98164-2050
                               (206) 623-4100 telephone
9                              (206) 623-9273 facsimile
                               E: hornbrook@wscd.com
10                             *Attorneys for Defendant Trans-System, Inc. and Bulk*
                               *Service Transport d/b/a James J. Williams*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS TRANS-SYSTEM, INC.'S AND
JAMES J. WILLIAMS BULK SERVICE
TRANSPORT'S TRIAL BRIEF (Cause No. 15-
05665 RJB) – 17
wsh / WSH / 6624.010 / 2621662_1



WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON 98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

## CERTIFICATE OF SERVICE

The undersigned certifies that under penalty of perjury under the laws of the State of Washington that on the below date I caused to be served the foregoing document on:

**Attorney for Plaintiffs**
Tamara S. Clower
Tacoma Injury Law Group
3848 S Junett Street
Tacoma, WA 98409
(  ) Via U.S. Mail
(  ) Via Facsimile:  253-572-6662
(  ) Via Hand Delivery
(x ) Via ECF:
    tammy@tacomainjurylawgroup.com;
    tamaraclower@yahoo.com

**Attorney for Plaintiffs**
Daniel R. Kyler
Rush, Hannula, Harkins & Kyler, LLP
4701 S. 19th St., Suite 300
Tacoma, WA 98405
(  ) Via U.S. Mail
(  ) Via Facsimile:  253-272-5105
(  ) Via Hand Delivery
(x ) Via ECF:  dkyler@rhhk.com

**Attorney for Plaintiffs**
Michael John Fisher
Rush, Hannula, Harkins & Kyler, LLP
4701 S. 19th St., Suite 300
Tacoma, WA 98405-1199
(  ) Via U.S. Mail
(  ) Via Facsimile:  253-272-5105
(  ) Via Hand Delivery
(x ) Via ECF:  mfisher@rhhk.com

**Attorney for Defendant Cosmo Specialty Fibers, Inc.**
Stephanie L. Bloomfield
Gordon Thomas Honeywell
1201 Pacific Avenue, Suite 2100
P.O. Box 1157
Tacoma, WA 98402
(  ) Via U.S. Mail
(  ) Via Facsimile:  253-620-6565
(  ) Via Hand Delivery
(x ) Via ECF:  sbloomfield@gth-law.com

**Attorney for Defendant AirGas Specialty Products, Inc.**
Tamara K. Nelson
Merrick Hofstedt & Lindsey, P.S.
3101 Western Ave Ste 200
Seattle, WA 98121-1024
(  ) Via U.S. Mail
(  ) Via Facsimile:  206-467-2689
(  ) Via Hand Delivery
(x ) Via ECF:  tnelson@mhlseattle.com

**SIGNED** this 20th day of July, 2017, at Seattle, Washington.

*/s W. Sean Hornbrook*
W. Sean Hornbrook

DEFENDANTS TRANS-SYSTEM, INC.'S AND
JAMES J. WILLIAMS BULK SERVICE
TRANSPORT'S TRIAL BRIEF (Cause No. 15-
05665 RJB) – 18
wsh / WSH / 6624.010 / 2621662_1



WILSON
SMITH
COCHRAN
DICKERSON

901 FIFTH AVENUE, SUITE 1700
SEATTLE, WASHINGTON  98164
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273